# SEIDMAN *v.* STATE

[No. 40, September Term, 1962.]

*Decided December 28, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, MARBURY and SYBERT, JJ.

*Frank B. Cahn, II,* with whom were *Paul A. Dorf* and *Dorf & Pollack* on the brief, for appellant.

*Harrison M. Robertson, Jr., Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney,* and *John Paul Rogers, Assistant State's Attorney,* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

The defendant-appellant, George Seidman, was convicted under each of seven separate indictments charging him with the statutory offense of pandering and under another indictment charging him with conspiracy "with one Earl Fifer, and certain other persons whose names are to the [Grand] Jurors * * * unknown, to violate the Pandering Laws of the State of Maryland." All eight cases were tried together in the Criminal Court of Baltimore before a jury. The defendant's motion for a new trial, applicable to all eight cases, was denied and he was sen-

tenced to six years' imprisonment on each case, all of the sentences to run concurrently. He appeals.

The defendant contends: first, that each of the pandering indictments was defective and should have been dismissed; second, that he was convicted on the uncorroborated testimony of accomplices; third, that the trial court abused its discretion in denying the defendant's motion to remove the case, or in the alternative to grant a postponement because of publicity; and fourth, that the evidence was insufficient to sustain his conviction for conspiracy.

The chief basis for the appellant's contention that each of the pandering indictments is insufficient is that none of them states the name of the woman from whose illicit earnings the defendant is alleged to have received money. Each of these indictments is based upon § 430 of Art. 27 of the Code (1957) which reads as follows:

> "Any person or persons who knowingly receive any money or other valuable thing 'without lawful, actual bona fide consideration' from the earnings of any woman or girl engaged in prostitution shall be guilty of a felony, and upon conviction thereof shall be sentenced to the penitentiary for not less than three nor more than ten years."

Each of the seven indictments for pandering under which the defendant went on trial (Nos. 3334-3336 and 3339-3342) contained one count based upon § 430 above quoted.[1] All of these were in the same form, except that each alleged a different date of the offense charged (which varied from March 18, 1960 to May 10, 1961) and charged that Seidman, on a date specified, at Baltimore, "feloniously did knowingly receive a certain sum of money, to wit, the amount whereof is to the Jurors aforesaid unknown and a certain other valuable thing a further de-

---

1. Each of these indictments contained a second count charging that the defendant engaged in lewdness and assignation (see Code (1957), Art. 27, §§ 15 (g), 16, 17); but verdicts of not guilty were directed on these counts, and we are not concerned with them.

Two indictments for pandering (Nos. 3337 and 3338) were not called for trial by the State.

scription whereof is to the Jurors aforesaid unknown, without lawful, actual and bona fide consideration, from the earnings of a certain woman whose name is to the Jurors aforesaid unknown, who was then and there engaged in prostitution; * * *."

Presentments were filed in the conspiracy and pandering cases on September 1, 1961, the defendant was released on bail on September 5, the indictments were returned on September 8, copies thereof were served on the defendant on September 28, 1961, and on that date he was arraigned and pleaded not guilty in all of the cases. A week later, on October 5, he filed a demand for particulars under each of the ten indictments, (including the two mentioned in footnote 1). This demand was a single document which referred to all ten cases. Item 4 of this demand sought "the name of the person 'who was then and there engaged in prostitution'" as set forth in Indictments Nos. 3334-3342. On October 6 the State answered the demand for particulars, stating as to two items that it had no such written statements, papers, documents, etc. as were sought, and excepting to the other five demands, including Item 4. There was a hearing on the demand and answer on October 6th. It is somewhat difficult to ascertain from the record precisely what the court's ruling was, but it seems clear that at that time the defendant did not get the information sought by Item 4.[2] On October 13 the defendant moved to dismiss the indictments in the pandering cases (but not in the conspiracy case) because of the indefiniteness of the indictments. On October 17 the State filed an answer to Item 4 of the demand for particulars in which it listed the names of nine women alleged to have been engaged

---

2. A docket entry in the conspiracy case (No. 3332) shows the filing on October 6th of the State's answer to the demand in that case and in the other nine, and the next entry in the conspiracy case shows (on the same date) "Motions heard and denied" with the name of the judge. In only one of the pandering cases now on appeal (No. 3334) do the docket entries show the filing of the demand for particulars and of the State's answer thereto. The docket entries in none of these show the disposition of the demand. A notation at the foot of the demand itself reads: "10/6/61 Denied as to 1-2-3" with the name of the judge. No action is stated as to Item 4 (or as to 5, 6 or 7).

in prostitution and identified them separately, one with each of the nine indictments Nos. 3334-3342. The defendant's brief states (and the State does not challenge the statement) that at the hearing on October 6, the court upheld the State's exception to Item 4 and that the trial judge later reversed his decision and required the State to furnish the names. Documents in the record show that orders to summon all nine of the named women to testify for the State in the conspiracy case (no reference being made to the other cases) were received by the Sheriff's office on October 11.

A hearing was held on October 17 on the defendant's motion to dismiss and the motion was denied. Subsequently, on October 23, just before the cases went to trial, the defendant asked for a list of witnesses who had appeared before the Grand Jury in order to determine whether the nine women named in the response to Item 4 filed on October 17 had appeared before that body and hence whether their names were necessarily known to it. The State objected to furnishing the information and the court denied the request, stating that it came too late and also noting the absence of precedent for it.

We do not have the benefit of anything in the record to show the basis for the court's denial of the defendant's motion to dismiss the indictment. It is inferable from the dates above stated that it was due at least in part to the fact that the names of the women involved had actually been furnished to the defendant by the time of the argument. The ruling might also have been based upon the fact that the motion had not been filed until after the defendant had pleaded and under Md. Rule 725 b 3, as then in force, the motion came too late, unless the court should "permit it to be made within a reasonable time thereafter." See *Mayer v. State,* 212 Md. 60, 127 A. 2d 630. (This particular provision as to time has not been included in Md. Rule 725 as revised, effective on January 1, 1962.) This possible ground to support the order has not been suggested by the State, and it seems at least fairly inferable that it could not have been successfully asserted, since it seems that the court did entertain and rule upon the motion after the defendant had pleaded, pursuant to the discretionary power contained in former Rule 725 b 3 above set forth.

Several general rules, we think, are clearly established: that an indictment must be so framed as to inform the defendant of the charge against him in order that he may prepare his defense and may also protect himself against a subsequent prosecution for the same offense; that an indictment in the language of the statute upon which it is based is generally good; that if the identity of a person referred to in an indictment which would ordinarily have to be stated, is unknown to the Grand Jury, the fact that it is unknown may be stated and the indictment will be sufficient; and that a bill of particulars forms no part of an indictment and hence cannot make an otherwise defective indictment good. No lengthy citation of authorities to support these statements of the law of this State seems necessary. See such cases as *Mincher v. State,* 66 Md. 227, 7 A. 451; *Delcher v. State,* 161 Md. 475, 158 A. 37; *State v. Lassotovitch,* 162 Md. 147, 159 A. 362 (containing an extensive review of cases); *Adams v. State,* 202 Md. 455, 97 A. 2d 281, reversed on another ground 347 U. S. 179; each of which cases supports one or more of the propositions above stated. Cf. *Dize v. State,* 212 Md. 1, 128 A. 2d 427, involving an arrest warrant and decided under rules applicable to indictments.

The rights of a defendant in a criminal case to be informed of the accusation against him and to have a copy of the indictment or charge in due time (if required) to prepare for his defense are protected by Art. 21 of the Maryland Declaration of Rights, and all other rules respecting indictments must, of course, accord protection to those rights.[3] A problem sometimes

---

3. There are statutory forms of indictment in false pretense cases and for murder or manslaughter (Code (1957), Art. 27, §§ 609, 616); and there are other statutory provisions as to what shall be sufficient statements regarding specified matters in indictments for gambling, for forging, uttering, etc., instruments or for obtaining property by false pretenses with intent to defraud, for robbery, larceny, embezzlement, etc., for selling liquor or beer unlawfully, and for the violation of ordinances (*Ibid.,* §§ 610, 612, 613, 614, 615). There are statutory requirements for furnishing bills of particulars in false pretense cases (*Ibid.,* § 608) and a similar Rule (Rule 715 b) and there is a comparable provision for a "statement" in § 614 of Art. 27, *supra.* So far as the validity of these statutes has been litigated it has been upheld, but not all indictments claimed

arises as to whether or not an indictment in the words of the statute (such as we have here) is sufficiently informative and if not, whether such defect is fatal or can be met by furnishing a bill of particulars. Bills of particulars have long been recognized in Maryland criminal practice (see *Neusbaum v. State,* 156 Md. 149, 143 A. 872; *Lanasa v. State,* 109 Md. 602, 71 A. 1058), and have been provided for as a matter of right in the instances mentioned in note 3 to this opinion. In other instances, their grant or refusal has been (and under our present Rule 715 a continues to be) ordinarily within the discretion of the trial court. The difficulty of problems of the kind stated was recognized by Judge Offutt in the *Neusbaum* case; and the two different types of situation have also been pointed out in a number of other cases. *Neusbaum* itself upheld a short, statutory form of indictment. *Larmore v. State,* 180 Md. 347, 24 A. 2d 284, upheld an indictment in the words of the statute, pointing out that any generality in it could have been corrected by a bill of particulars. *Richardson v. State,* 175 Md. 216, 218, 200 A. 362, also upheld an indictment in the words of the statute as being sufficiently informative. It said nothing about a bill of particulars.

On the other hand, lack of a full allegation of an essential matter where known, even though the indictment may follow the language of the statute or of a statutory authorization, may be fatal and was so held in *State v. Nutwell,* 1 Gill 54; *State v. Blizzard,* 70 Md. 385, 17 A. 270 (failure to describe sufficiently the security allegedly obtained by false pretenses or to state its ownership) ; *Armacost v. State,* 133 Md. 289, 105 A. 147 (failure to state ownership of property allegedly obtained by false pretenses) ; *State v. Lassotovitch, supra.* Both the *Nutwell* and the *Lassotovitch* cases involved the giving of the names of third persons, as does the present case. In *Lassotovitch* the names omitted were those of persons to whom the defendants were charged with having paid less than prescribed minimum wages. In that case this Court said (162 Md. at 155) : "We have been

---

to be valid thereunder have been upheld. See the cases cited in notes to the various sections referred to in the 1957 Edition of the Code and the 1962 Cumulative Supplement thereto.

unable to find any cause in this state upholding an indictment under that class of statutes spoken of by Judge Miller in *Mincher v. State, supra,* illustrated by statutes prohibiting the sale of liquor on Sunday, where the name of the party to whom the liquor was alleged to have been sold has been omitted. We are of the opinion that the statute now before us is of that class, and that the indictment should contain an allegation setting forth the names of the 'laborers, workmen or mechanics' who were paid, on the date alleged, less than the current rate of *per diem* wages in the locality where the work was performed."

We think that the present case falls into the same category and that the rule recognized in *Lassotovitch* and in *Delcher* is applicable—that a bill of particulars is not a part of the indictment and cannot supply the lack of an allegation required to be stated therein.

On their face the seven indictments for pandering would appear to be good as being in the words of the statute and as containing allegations of lack of knowledge on the part of the Grand Jury as to a fact or facts which would ordinarily be required to be stated. *Adams v. State, supra.* However, the names of the women, if known, should, we think, have been stated in accordance with the authorities above cited. See also *State v. Underwood,* 155 P. 194 (Ore.) ; *Perkins on Criminal Law,* p. 336, n. 35.

The real difficulty here arises from the question of whether or not the allegations that the names of the women were unknown to the Grand Jury is a correct allegation. The State argues that "the record is devoid of any evidence that the Grand Jury had such knowledge or that such information could have been readily obtained." The court's ruling denying the defendant a list of witnesses who had appeared before the Grand Jury cut him off from the most convincing evidence which he could possibly have adduced to show that the Grand Jury did know who the women were.[4] The request was broadly phrased,

---

4. The names of several police officers were listed on the backs of the indictments, but none of the women's names appeared thereon.

but the colloquy makes clear the exact question as to which the information was sought. The State objected to being required to furnish the information, and the court sustained its position.

We have not been referred to, nor have we found, any case in this State which is directly in point on the situation presented in the instant case. Md. Rule 725 b applied in 1961 (as it does now) to "[d]efenses and objections based on defects in the institution of the prosecution or in the indictment," and required that such objections (other than lack of jurisdiction or failure to charge an offense) be raised before trial. Failure to raise such an objection amounted to a waiver thereof, from which the court might, however, grant relief for good cause shown. Under Rule 725 a then (as now) a motion to dismiss or for other appropriate relief was a proper pleading, and demurrers and motions to quash were abolished. A motion to quash filed after Rule 725 a had been adopted was treated by this court, as it had been treated by the trial court, as a motion to dismiss in *State v. Cherry*, 224 Md. 144, 167 A. 2d 328. Here the motion filed on October 13, 1961, was properly designated as a motion to dismiss. In terms in use prior to the adoption of Rule 725 a (or its predecessor) this motion would have been a motion to quash (or a motion in the nature thereof), rather than a demurrer, and its scope therefore would not have been limited solely to matters appearing on the face of the indictment. For reasons more fully stated below we think that in the situation existing in this case it was an appropriate means of raising the question with which we are now concerned.

The rule most widely recognized in other jurisdictions is, we think, that if the grand jury knew, or with reasonable effort could have known a fact, which, if known, should have been stated in the indictment, an allegation that it is not known to the grand jury is not sufficient to sustain a conviction, and further, that if the defense raises a reasonable inference that the grand jury knew or with reasonable effort could have known such a fact which is stated as unknown, then the State must assume the burden of justifying the allegation of absence of knowledge by showing that the grand jury did not in fact have knowledge or could not reasonably have obtained it. See *Carter*

*v. State,* 87 N. E. 1081 (Ind.), accepted in *Wertheimer v. State,* 169 N. E. 40, 45 (Ind.); *State v. Klasner,* 145 P. 679 (N. Mex.); *Carlisle v. State,* 93 S. W. 2d 730 (Texas); *Bishop's New Criminal Procedure* (2d Ed. 1913), section 549, p. 445, section 550, pp. 446-47, and section 552, p. 448, and the many cases cited therein; but cf. cases seemingly *contra* cited at p. 448, and see *Merwin v. People,* 26 Mich. 298, 301, in which the court seems to say that the burden is on the defendant to prove that the grand jury actually had knowledge.

The cases which have dealt with this problem have generally, if not invariably, dealt with it on the basis of evidence developed at the trial rather than on matters presented at a preliminary hearing. We see no reason why, in proper circumstances, it may not be raised as a preliminary matter. As Bishop points out (*op. cit. supra,* § 550), the question really is not whether there is a variance, which we suppose could be decided only after trial, but is whether a necessity exists for allowing some matter to be alleged as unknown to the grand jury which would have to be stated if it were known to, or reasonably ascertainable by, the grand jury. See *Adams v. State, supra.* It is, we take it, the rule that in the absence of any evidence to the contrary, the allegation that a matter is unknown to the grand jury will be presumed to be true, *Coffin v. United States,* 156 U. S. 432, at 451; but we see no reason for holding that the correctness of the allegation may never be inquired into before trial, and we think that under our Rules and practice it may be.

In the instant case the bill of particulars, when furnished, and the previous issuance of summonses for the very persons named in the bill to testify as witnesses in the conspiracy case were sufficient, we think, to give rise to a reasonable inference that the grand jury either knew, or could with little trouble have ascertained, the names of the prostitutes from whose earnings the defendant was charged with receiving money or some other thing of value. The bill of particulars linked each of the alleged prostitutes with one particular indictment, and each particular indictment (as we have noted) referred to a specific date. It seems a fair inference that the source or sources which furnished the information which served as the basis for the

charges in the indictments — whether such information came from the police officers whose names appeared as witnesses on the backs of the indictments or from other persons—could have provided, if they did not actually provide, the names of the alleged prostitutes involved.

Since the bill of particulars had been furnished and the order for summons for witnesses in the conspiracy case had been filed before the hearing on the motion to dismiss, we think that the foundation for the inference of knowledge or ready means of knowledge on the part of the grand jury was then known or readily available as a part of the court records and was clearly apparent when the motion was renewed and again denied just before the trial began. Rules 725 b 4 and 6, as then in force (now included in substance in Rules 725 c and d), plainly contemplate that all issues of fact pertaining to such a motion may be determined in advance of the trial. In the situation here presented, it seems to us proper to apply at the motion stage of proceedings the same rule which the cases generally apply after the evidence has been produced at the trial with regard to material facts stated in the indictment to be unknown to the grand jury. Cf. *Watts v. State,* 99 Md. 30, 57 A. 542, involving (*inter alia*) a motion to quash based upon an amendment to an indictment and holding such a motion proper. We are, accordingly, of the opinion that in the light of the inference fairly deducible from the facts, it was incumbent upon the State to show that the Grand Jurors did not know, and could not with reasonable effort have learned, the names at the time the indictments were issued. The State chose not to undertake the burden, resting instead on arguments that there was no evidence in the record to show that the jurors did know the names of the prostitutes.

If the burden rested upon the accused to prove absolute knowledge on the part of the grand jury of something alleged to be unknown, such a burden could scarcely be sustained where, as here, the trial court denied the appellant his best means of proving that the Grand Jurors knew the names of the prostitutes—by denying the motion to require the State to furnish the names of the witnesses who appeared before the grand jury.

Such a situation could scarcely have arisen if our present Rule 717 requiring the disclosure of the names of witnesses before the grand jury had been in force in October, 1961.

The State further contends that in any event the appellant's cause was not prejudiced because the names were provided prior to trial in a bill of particulars. This argument is not sustainable since a bill of particulars may not be used to supplement and cure a defective indictment (*State v. Lassotovitch, supra; Delcher v. State, supra,* 161 Md. 475, 158 A. 37.)

In accordance with the views above expressed the convictions under the pandering indictments must be reversed and the cases remanded. There would appear to be no bar to new indictments, if they should be thought desirable. See *Basta v. State,* 133 Md. 568, 572, 105 A. 773.

Since we find it necessary to remand the case for further proceedings which may result in a trial on new indictments for pandering, we deem it appropriate under Md. Rule 885 to express our views as to whether the women were or were not accomplices of the defendant in this offense, because if they were, the defendant could not be convicted on their uncorroborated testimony.

An examination of the statute (Art. 27, § 430, *supra*) upon which the indictments are based makes it perfectly clear that a woman engaged in prostitution cannot herself be guilty of the substantive offense denounced by that section. She cannot receive her earnings from herself. It is stated that to be considered an accomplice one must have participated in the crime knowingly, voluntarily and with common intent with the principal offender, or must have unlawfully cooperated, aided or abetted in its commission (see *Seward v. State,* 208 Md. 341, 118 A. 2d 505, for such a case of aiding and abetting), but following such statements this court has in a number of cases stated the test to be whether the witness could himself or herself have been indicted and punished for the offense either as a principal or as an accessory. See *Harriday v. State,* 228 Md. 593, at 596, 182 A. 2d 40; *Coleman v. State,* 209 Md. 379, at 385, 121 A. 2d 254; *Watson v. State,* 208 Md. 210, at 217, 117 A. 2d 549. See also *Wharton on Crim-*

*inal Evidence* (12th Ed.) § 448, p. 230, and *People v. Jelke*, 1 N. Y. 2d 321, 135 N. E. 2d 213. Under the test above stated, none of the women here would be deemed an accomplice. The woman's position under the statute here relevant is analogous to that of a victim, and the victim of an offense is not treated as an accomplice under the corroboration rule. See *Basoff v. State*, 208 Md. 643, 119 A. 2d 917 (woman upon whom an abortion was performed) ; *Gregoire v. State*, 211 Md. 514, 128 A. 2d 243 (minor victim of a perverted sexual practice) ; *Lusby v. State*, 217 Md. 191, 141 A. 2d 893 (minor daughter victim of incest).

What we quoted in *Coleman v. State, supra,* 209 Md. at 385, from *Wharton (op. cit. supra)*, is apropos here: "The term 'accomplice' does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense" (as in this case under § 15 (g) of Art. 27 of the Code). We conclude that the women here involved were not accomplices of the defendant in his alleged violation of § 430 of Art. 27 of the Code (1957).

A related problem is whether or not they were co-conspirators with the defendant Seidman in the conspiracy charged as between him and Fifer and persons unknown to violate the laws against pandering. We recently had occasion to consider a somewhat similar problem in *Robinson v. State,* 229 Md. 503, 184 A. 2d 814, but it was not the same. Cooperation between the writer and player of numbers or lottery is logically necessary to the commission of the substantive offense of selling lottery, though the offense is one for which only the writer can be punished. Under the statute here involved no cooperation is logically necessary to the commission of the substantive offense, for which only the person receiving the earnings of a woman engaged in prostitution may be punished. There is a considerable analogy and a strong similarity in general purpose between this statute and the Federal statute known as the Mann Act, which prohibits and penalizes the transportation of women in interstate commerce for immoral purposes. In *United States v. Holte,* 236 U. S. 140, it was held possible for a woman to be a co-conspirator in an agreement for her own transportation in violation of that statute, and a demurrer to an indict-

ment charging such a conspiracy was therefore held not to be sustainable. However, in *Gebardi v. United States,* 287 U. S. 112, where the case had been tried and the evidence showed merely that the woman had consented to being transported in interstate commerce for an immoral purpose it was held that she was not guilty of conspiracy to violate the statute. The *Holte* case was distinguished as showing only that the woman could be guilty of conspiracy to violate the Act if she took a more active part than mere agreement on her part to the transportation and its immoral purpose (p. 119). In *Gebardi* Mr. Justice Stone, after saying that the Court did not rest its decision on either the concert of action rule [as to which see *Robinson v. State, supra*] or upon the related theory that the attempt was to prosecute as conspiracy acts identical with the substantive offense, said (at p. 123) : "We place it rather upon the ground that we perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished. We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter."

We think that the reasoning of the *Gebardi* case is applicable here, and that the *Holte* case is to be distinguished here as it was there. The evidence in this case shows that each of the women worked as a "female sitter" (for which she was not paid) or perhaps as a waitress or barmaid, at the night club of which Seidman was the manager on six nights a week, and of which Fifer, who usually was the doorman, acted as manager on Seidman's night off, that each of the women "worked out of" that club, and that each of them regularly paid Seidman or Fifer (whichever one was on duty) $5.00 for each time that she went out on a "successful date" (i.e., for prostitution) with a customer. (One girl said that she never paid Fifer any money.)

There was also testimony that the girls approached the defendant to ask if they might work out of the club, that they would often be introduced by the defendant (or in his absence by Fifer) to various men sitting at tables or at the bar, that each girl made her own arrangements with her customers, including the price to be charged and the place where they should go, and that the defendant did not make these arrangements for them. Some of the witnesses testified that the defendant did not tell them that they must pay him, but two testified that he did and another said that he would hold out his hand for money. Some of the witnesses thought they should pay the defendant or pay Fifer on the nights he was there. Two of the seven said that they had instructions from Seidman to pay Fifer when Seidman was not there.

We think that the evidence shows that the witnesses acquiesced in or consented to the arrangement under which Seidman and Fifer received a part of their earnings from prostitution, not that they were initiators of or active participants in a plan or agreement for the defendant and Fifer to violate the laws against pandering. They simply paid the tariff for working out of the club. We repeat that the conspiracy charged was one between Seidman and Fifer and persons unknown to the grand jury. The case does not appear to have been tried on the theory that these witnesses were actual parties to the conspiracy. It seems significant in this connection that there was no motion to dismiss the conspiracy indictment, and hence no such question was raised with regard to non-disclosure under it as that presented by the motion to dismiss the indictments for pandering.

We think that both the legislative purpose to impose no penalty under § 430 of Art. 27 on the woman engaged in prostitution and the evidence in this case make the reasoning of *Gebardi* applicable here. Indeed, on the evidence in this case, we do not see how if these witnesses were accomplices they would not by the same token be co-conspirators. Conversely, if they were not co-conspirators, they were not accomplices. Applying the rule of the *Gebardi* case, we accordingly hold that these witnesses were not co-conspirators and likewise that they were not accomplices of the conspirators. Therefore, we further hold that

their testimony did not require corroboration in order to sustain the conviction under the conspiracy indictment, if it was otherwise sufficient to do so.

The defendant contends that it was not, but we do not agree. A conspiracy may be shown by circumstantial evidence from which an inference of a common design may be drawn and it is not necessary to demonstrate that the conspirators met and agreed in terms to a design and to pursue it by common means. *Piracci v. State,* 207 Md. 499, 115 A. 2d 262; *Greenwald v. State,* 221 Md. 245, 157 A. 2d 119, app. dismissed 363 U. S. 721. Here we think the evidence, both circumstantial and in some instances direct, was sufficient to warrant the inference that the defendant Seidman and Fifer entered into a common plan to violate the pandering laws, and that each of them participated in carrying it into effect.

The remaining contention (the appellant's third) relates to publicity. The publicity complained of can be divided into two main categories: (1) those news stories which discussed investigations of various matters pertaining to an area in Baltimore known as "The Block" and cases growing out of those investigations, of which the instant case was an example, and (2) those stories which reported the trial and conviction of Earl Fifer on charges similar to those levelled against the appellant. One exhibit in the former category was a newspaper article appearing in the Baltimore News-Post, on October 17, 1961, concerning the trial of one Calvin Foster, Jr., for conspiracy to kidnap one Corbi who was linked in the article with Earl Fifer, the article concluding:

> "The Corbi-Fifer case kicked off a widespread police investigation. The Grand Jury took up the case and gradually expanded it into a full-blown rackets probe. The indictment of Foster and 16 others was the result."

The appellant contends that this article linked Fifer with a kidnap-murder ring, that the alleged connection of Fifer with appellant also tended to link the latter with the same ring, and that therefore appellant could not receive a trial untainted by

the publicity regarding all activities revealed in investigations of "The Block".

The articles falling into the second category appeared in Baltimore City newspapers during the trial of Earl Fifer which ended in his conviction on the Friday before appellant's trial began on Monday. These articles, in commenting on the evidence adduced at Fifer's trial, stated:

> "Before Fifer testified the State called a sixth young woman as its seventh witness, to have her tell of paying fees to either Seidman or Fifer 'because he'd introduce me to the guys' she met in the club and 'went out with.' Witnesses had testified Fifer received such payments on Thursdays when Seidman was off duty.
>
> * * *
>
> "Evidence produced by Mr. Maxwell and John Paul Rogers, prosecutors, showed that the regular floor manager, Seidman, also got shares from such earnings of the sitters. Seidman is under indictment for pandering and conspiracy, and faces later trial."

A second article, in referring to Seidman, stated:
> "Under present schedules, George Seidman, floor manager at the Copa, is due for trial Monday for conspiracy and pandering on a total of ten charges.
> Seidman's name has figured throughout the Fifer case testimony. * * *."

The third article, reporting the conviction of Fifer, again linked him with the Corbi kidnap plot which led to widespread investigations of "The Block."

The trial judge denied both the motion for removal and the motion to postpone. He was of the opinion that the *voir dire* examination would satisfactorily determine whether any juror had been influenced by the news reports, and on *voir dire* he asked:

> "And the fourth question is this: I'm going to preface it a little bit. The cases in which you may be selected as jurors are several of a series that were the

result of an investigation by the Grand Jury. They did attract considerable attention in the press, on the radio and on television. It may be that you or some of you have read accounts of some of the matters or you may have seen or heard something about them as a result of the publicity, and my question to you is this: If you have read, heard or seen anything in connection with that series of investigations, do you have any opinion at this time as to the guilt or innocence of the accused George Seidman? If you do, please raise your hand and identify yourself. * * * "

There was no response by any of the prospective jurors, and the court commented upon that fact.

The question of whether a non-capital criminal case should be removed to another jurisdiction is one which rests within the trial court's discretion, Maryland Constitution, Art. IV, sec. 8; Maryland Rules 542 a (1) and 738 (b); but the trial court's decision is reviewable on appeal for a determination of whether there has been abuse of discretion. *Downs v. State,* 111 Md. 241, 73 A. 893; *Piracci v. State,* 207 Md. 499, 509, 115 A. 2d 262; *Basiliko v. State,* 212 Md. 248, 129 A. 2d 375.

We find no abuse of discretion by the trial court in this case. Appellant did not meet his burden of persuasion with regard to his claim, for the prior cases in this State hold that the accused must make an affirmative showing that he has been prejudiced by the newspaper reports, and that the accused was not in a position to rely upon the *voir dire* examination for protection against a prejudiced juror. *Gray v. State,* 224 Md. 308, 167 A. 2d 865; *Basiliko v. State, supra; Grammer v. State,* 203 Md. 200, 100 A. 2d 257; *Wanzer v. State,* 202 Md. 601, 97 A. 2d 914; *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 67 A. 2d 497; and *Newton v. State,* 147 Md. 71, 127 A. 123.

Here the trial court could properly find, as it did, that the articles which appeared prior to trial did not show prejudicial public reaction to the appellant (cf. *Piracci v. State, supra,* at 511), and he asked on *voir dire* whether any juror had formed an opinion of appellant's guilt or innocence as a result of news coverage of "The Block". This is not, therefore, a case in which

appellant had no way to protect himself from jurors who may have been influenced by press coverage. Cf. *Basiliko v. State, supra,* where the articles appeared during the course of the trial when the protection of *voir dire* was not available.

On the general subject of newspaper publicity and a fair trial in a criminal case, see also the remarks of Mr. Justice Holmes in *Holt v. United States,* 218 U. S. 245, 251 (in which newspaper articles appeared during the course of the trial and were apparently read by jurors who had been allowed to separate) : "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

Concluding as we do that there was error in the ruling on the motion to dismiss the indictments for pandering and that there was none under the indictment for conspiracy, we reverse the convictions in the former cases and remand them for further proceedings and we affirm the judgment in the conspiracy case.

> *Judgments reversed in the cases charging pandering (Indictments Nos. 3334-3336 and 3339-3342) and cases remanded for further proceedings not inconsistent with this opinion. Judgment affirmed on the charge of conspiracy (Indictment No. 3332); costs of these appeals to be paid one-half by the Mayor and City Council of Baltimore and one-half by the appellant.*