# MILTON GORDON *v.* STATE OF MARYLAND

[No. 331, September Term, 1971.]

*Decided February 1, 1972.*

The cause was argued before MORTON, ORTH and MOY-LAN, JJ.

*William C. Miller* and *James Robert Miller,* with whom were *Miller, Miller & Steinberg* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *William M. Cave, Deputy State's Attorney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

MILTON GORDON, Attorney at Law, has been twice found guilty by his peers of the charge that on 8 Septem-

ber 1966 and thence continually until 23 December 1966, he did "unlawfully embezzle from Raymond Francis Scholl, Jr., and Mary E. Scholl" the sum of $13,895.04, "in violation of Article 27, Section 129, of the Annotated Code of Maryland." The judgment resulting from the conviction at the first trial in the Circuit Court for Somerset County was reversed upon direct appeal to this Court and the case remanded for a new trial. *Gordon v. State,* 5 Md. App. 291, *cert. denied,* 252 Md. 730. The judgment resulting from the conviction at the second trial in the Circuit Court for Montgomery County is now before us for review upon a direct appeal timely filed.[1] Gordon seeks to set aside his conviction at the second trial, claiming that the lower court erred in:

(1) failing to rule on his motion to dismiss the indictment until after the conclusion of the trial;

(2) denying his suggestion for removal;

(3) denying his motion to sequester the jury;

(4) permitting proof of other crimes;

1. The history of the case is set out in Gordon's brief but the record before us on this appeal reflects none of the proceedings prior to 9 July 1970. According to Gordon, and substantiated in part in our opinion in *Gordon, primus,* he was originally charged under an indictment filed by the Grand Jury for Montgomery County on 8 February 1967. The indictment contained three counts —embezzlement, larceny, and larceny after trust. Upon suggestion of Gordon for removal, the indictment came on for trial in the Circuit Court for Somerset County. The larceny count was "abandoned" by the State at the trial; the jury returned verdicts of guilty of embezzlement and not guilty of larceny after trust. Our opinion reversing the judgment and remanding for a new trial was filed 10 October 1968. The Court of Appeals denied certiorari 11 March 1969. The case was removed for trial to the Circuit Court for Wicomico County. On 4 December 1969 that court dismissed the indictment because of the illegal composition of the Grand Jury returning it. On 9 July 1970 the Grand Jury for Montgomery County returned another indictment containing only one count charging embezzlement in the exact language of the original indictment. This indictment came on for trial in the Circuit Court for Montgomery County on 18 January 1971. Gordon's motion for a mistrial was granted and a mistrial declared. Trial resulting in the instant conviction commenced on 2 March 1971, the verdict of guilty was rendered on 3 March, and a sentence of 3 years was imposed on 13 May. There were ten pretrial motions filed and disposed of at various times.

(5) admitting certain records in evidence;
(6) denying his motion for judgment of acquittal;
(7) instructing the jury
    (a) with respect to the money alleged to have been embezzled, as to:
        (i) ownership;
        (ii) possession;
    (b) as to agency.

### (1)

On 12 January 1971 Gordon filed a motion to dismiss the indictment.[2] The docket entries under date of 15 January read that upon hearing before Mathias, J. "ruling reserved until trial of the general issues", that subsequently on that date the court ordered the words "ruling reserved" stricken and ordered that the motion to dismiss "be deferred for determination at the trial of the case." On 18 January, according to the docket entries, a jury was sworn, Clapp, J. presiding. There immediately follow these entries, each under date of 18 January:

> "Defendant's Motion for a mistrial and Motion granted and a mistrial declared and Jury dismissed by the Court."
> "State's Motion that the Court make a decision on defendant's Motion to dismiss before Trial of this case."

The docket entries do not show that any action was taken by the court on this last motion.[3] The transcript in the record shows that the indictment came on for trial on 2 March in the Circuit Court for Montgomery County with Judge Clapp presiding. Prior to the selection of a jury the motion to dismiss was brought to the attention of the

---

2. The reasons given as the basis for the dismissal are not material to a determination of the contention.

3. The record before us does not contain a transcript of any of the proceedings with respect to the motion to dismiss reflected in the docket entries.

court at a bench conference. The court said he had reserved his decision on 18 January when the matter was argued before him and "I want to reserve decision now so I will not rule on that at this time." The trial proceeded. The transcript ends with these words "(Whereupon, the jury retired to consider its verdict at 11:50 o'clock a.m. [on 3 March], returning with a verdict at 1:00 o'clock p.m.)." The transcript does not show any decision on the motion to dismiss. For what next happened regarding it we return to the docket entries: They read:

"March 3, 1971  Verdict: Guilty
March 3, 1971  Defendant's Motion to dismiss Indictment, overruled."

Gordon does not question the authority of the court to order that the motion be deferred for determination at the trial of the general issue. Maryland Rule 725 d. Compare Rule 729 d. But, he points out, the motion was not determined at the trial of the general issue as the Rule provides, but after the trial on the general issue. This, he argues, was not in accordance with the Rule and he claims the proper sanction for the violation is a reversal of the judgment. We do not see it that way. Assuming that the docket entries record the proceedings in the order of their occurrence, there was no ruling on the motion until after the verdict and the "trial" had ended.[4] The lower court was wrong in not announcing its determination of the motion during the trial of the general issue. However, Rule 725 provides no sanction for its violation. We held in *Saunders v. State,* 8 Md. App. 143, 146-147, following the dictate of the Court of Appeals in *Brice v. State,* 254 Md. 655 that in the absence of waiver, the failure to rule on a pretrial motion was error

4. In *Ash v. State,* 238 Md. 317, 321 the Court said:
"The weight of authority is that a criminal 'trial' ends when the guilt or innocence of the accused is determined, i.e., when the verdict is returned, not when the judgment or sentence is pronounced."

requiring reversal. But in each of *Saunders* and *Brice* the motion in question was never ruled upon. Here it was ruled upon and from the record was the next action taken after the verdict. It would seem that the failure to rule before the verdict was mere inadvertence. Gordon alleges no prejudice by the late ruling and we see none. Unlike either *Saunders* or *Brice* the propriety of the action on the motion was preserved for appellate review had Gordon desired to present the question. In the circumstance we feel the error was harmless and does not require reversal of the judgment.

## (2)

On 11 January 1971 Gordon filed an "Affidavit in Support of Suggestion of Removal." Rules 542 and 738. The docket entries show it was heard before Mathias, J. on 12 January and denied. On 25 February 1971 Gordon filed a "Motion to Reconsider Affidavit of Removal." It was heard by Clapp, J. on 2 March before the start of the trial. The only record before us on the matter is contained in the transcript of the proceedings.

> "MR. JAMES MILLER (Defense Counsel) : We also filed, if the Court please, a motion to reconsider the signing of our affidavit of removal which is still open. I do not desire to argue that any further other than what is contained in the motion. I will be glad to furnish a copy of the Washington Post newspaper article to which I refer.
>
> THE COURT: Gentlemen, as we discussed this matter also in chambers, my reaction in connection with removal, because of unfavorable newspaper publicity, that in certain cases it is the only thing to do, but in many cases the removal to another court means it brings it more forcible to the attention of the jurors than might be the existence here.
>
> I would deny the motion to reconsider your suggestion of removal."

In his brief Gordon refers to the reasons for the declaration of a mistrial on 18 January 1971 and articles which appeared in the Washington Post on 19 January and 3 March and in the Wheaton News on a date not disclosed. None of these is a part of the record before us. In *McLaughlin v. State*, 3 Md. App. 515 we said, at 520:

> "The question of whether a non-capital criminal case should be removed to another jurisdiction is one which rests within the trial court's discretion. Maryland Constitution, Art. IV, Sec. 8; Maryland Rules 542 (1) and 738 (b). However, the trial court's decision is reviewable on appeal for a determination of whether there has been an abuse of discretion. *Seidman v. State*, 230 Md. 305, 187 A. 2d 109 (1962); *Benton v. State*, 1 Md. App. 647, 652, 232 A. 2d 541 (1967)."

See *Cleveland v. State*, 12 Md. App. 712, 716-717. On the record here we cannot say that there was an abuse of judicial discretion in denying the suggestion to remove the case or the motion to reconsider the suggestion. And we observe that both this Court and the Court of Appeals have held that newspaper disclosures standing alone do not support a defendant's suggestion that such disclosures deny him a fair trial. *Gray v. State*, 224 Md. 308, 316 and cases cited; *McLaughlin v. State, supra*, at 520-521. We hold there was no error in the denial of the suggestion to remove and the motion to reconsider.

### (3)

On 2 March 1971 prior to the start of the trial Gordon moved to sequester the jury.[5] Filing the motion defense counsel said that the prosecutor had advised him there was a possibility that the case would be completed in one day and therefore the court may want to withhold

---

5. The motion stated that it was pursuant to Rule 543 a 8. This rule applies only to procedure at law. Rule 1 a 1; Rule 5 a. The matter is covered by statute, Code, Art. 51, § 22 as discussed *infra*.

252

ruling on the motion. The court said: "I will withhold ruling on your motion to sequester. It will be moot if we finish in one day." The docket entries show that subsequently the motion was "overruled." According to the transcript, about 4:00 p.m. the court told the jury it would not be possible to complete the case that day and that the court would recess until the next day. It then said:

"If you recall I asked you on voir dire examination about whether you were willing to abide by your oath, not to have any contact, discussion or knowledge from anyone or any media about this case. I call your attention to the fact that the Court is empowered in cases where there may be public interest in newspaper accounts and radio and television to sequester a jury, which means to keep you tonight; not permit you to go home and stay in various rooms until such time as you are called back. I have always been very reluctant to do that because I have a great deal of confidence in the integrity of jurors. When they say they will conscientiously live up to their oath, they mean it. I feel that way about you ladies and gentlemen.

I especially urge you, therefore, to remember the Court's instruction not to discuss this case among yourselves, not to discuss it with anyone else. That includes wives, husbands, sweethearts and children; not to listen to the news media of any kind or to watch the news media of any kind, and to keep a completely open mind until you come back and your duties are concluded in this case. I have every confidence that you will live up to it and when you do finally get around to reading the various media and listening to it on the television, you may be surprised in what you hear."

The jury was excused. Gordon claims the denial of his motion compels reversal of the judgment. He urges that "the pretrial publicity as well as the newspaper articles on the day of the trial contained information which was not admitted at the trial, as well as information concerning appellant's prior convictions in both Maryland and Florida."

Code, Art. 51, § 22 provides: "The jurors sworn to try a criminal action may, at any time before the submission of the case to the jury, in the discretion of the court, be permitted to separate or may be kept in charge of proper officers." Both the Court of Appeals and this Court have abided by the rule that prejudice must be demonstrated and is not to be assumed merely from the fact of separation where there is a possibility of influence or contamination from outside contact. *Veney v. Warden,* 259 Md. 437, 443; *Graef v. State,* 1 Md. App. 161, 170. The record here does not disclose a demonstration of prejudice. Thus we conclude that the jurors adhered to the admonition of the trial court and that Gordon suffered no prejudice on account of the jury's separation. Therefore there was no abuse of judicial discretion. We hold that the trial court did not err in the denial of the motion to sequester the jury. See *Wilson v. State,* 4 Md. App. 192, 195-201, *cert. denied,* 251 Md. 753, *cert. denied,* 394 U. S. 975, 89 S. Ct. 1467.

### (4) and (6)

The evidence adduced at the first trial and in the trial on remand was in all material aspects the same. Gordon complains on this appeal that the court erred in permitting proof of other crimes. The "other crimes" referred to the misuse of escrow funds other than those of the Scholls as admitted by Gordon according to the testimony of one Benjamin Dulaney. Gordon concedes that "had the State been able to establish a prima facie case of guilt of the offense charged in the indictment that the testimony of Dulaney would have been admissible under one or more exceptions to the general rule" which

is that evidence of a distinct substantive offense cannot be admitted in support of another offense. *MacEwen v. State,* 194 Md. 492, 500-501. In so conceding, Gordon accepts our ruling in *Gordon primus* at 306-307 that the challenged evidence was not inadmissible *per se* and narrows his reason for the claim of inadmissibility, arguing that absent the establishment of a *prima facie* guilt of his embezzlement of the Scholl funds, such evidence could not be properly introduced. He alleges that the requisite *prima facie* proof of guilt was not established. The short answer is that we find it was established. Therefore we hold that the lower court did not err in permitting proof of other crimes.

We find that there was *prima facie* evidence of Gordon's guilt because the evidence in law was sufficient to sustain his conviction of the offense charged. In other words the evidence adduced showed directly or supported a rational inference of the facts to be proved, from which the jury could be properly convinced, beyond a reasonable doubt, that Gordon embezzled money from the Scholls as charged. We so found in *Gordon primus* in ruling that the trial court there did not err in denying a motion for judgment of acquittal, 5 Md. App. at 301-306, and, the evidence being not materially different here, there is no reason to depart from that ruling.

Gordon argues now that there was insufficient proof that he had "actual possession of the money alleged to have been embezzled." We found in *Gordon primus* that Gordon was the Scholls' agent "who received 'for or in the name or on account of' the Scholls the money to cover the Emigrant indebtedness—money which the proof showed he personally thereafter fraudulently embezzled." Id., at 305. We so find here and conclude that the jury could properly determine therefore that Gordon had such possession of the funds as is contemplated by the statute.[6] Cf. *Loker v. State,* 250 Md. 677.

---

6. We said in *Gordon primus* at 303:
   "By its express terms, Section 129 requires proof that the accused (a) was employed as a cashier, servant, agent,

Gordon also claims that there was no evidence to show directly or support a rational inference that he fraudulently embezzled any funds of the Scholls. The funds alleged to have been embezzled were received by Gordon to pay off a first mortgage or trust outstanding on property the Scholls had purchased. On 8 September 1966 the funds were deposited in the real estate escrow account of the Gordon & Myers law firm in the State National Bank. As shown by the bank's ledger sheets, there was a credit balance of $271,465.34 in the account on 9 September. On 24 October there was a deficit of $23,193.14 and from that date, with the exception of several days the latter part of October, the account was overdrawn. When the account was closed on 23 December there was a deficit of $8,147.11. The lien on the property purchased by the Scholls was never released.[7] We think it a rational inference from this evidence that the Scholls' funds had been stolen.

We hold that the lower court did not err in denying the motion for judgment of acquittal.

## (5)

Gordon questions the admissibility of State's Exhibits Nos. 5A, 5B, 6A, 6B, 7, 8, 10A and 10B. He alleges their admission violated the "shop book" rule as it now exists in Maryland because a proper foundation had not been laid.

Code, Art. 35, § 59 provides that any record or a photostatic or photographic reproduction thereof, made as a record of any transaction shall be admissible in evi-

clerk or officer by a person or body corporate; (b) that in such capacity he received personal property 'for or in the name or on account of his master or employer'; and (c) that he thereafter fraudulently embezzled such property. The statute does not require that the embezzled property be entrusted to the accused directly by the master or employer; it may be entrusted by another person on his behalf."

7. On 23 November 1966 the company issuing the title insurance on the property purchased the deed of trust note covering the property for $14,564.72. At the time of the Scholls' settlement the balance due was $13,095.04.

dence in proof of said transaction if (1) made in the regular course of business, and (2) it was the regular course of business to make such record or reproduction, at the time of said transaction or within a reasonable time thereafter. Photostatic or photographic reproductions of such admissible documents, photostated or photographed at a later time shall likewise be so admissible if photostated or photographed in the regular course of business in good faith and without an intent to defraud. "All other circumstances of the making of such writing or record, or photostatic or photographic reproductions thereof, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight, but not the admissibility thereof." See *Hyman v. State,* 4 Md. App. 636, 641-642. The rule is that business records may be introduced, even though hearsay in nature, when the entry meets the test of "necessity and circumstantial guaranty of trustworthiness." *Burroughs Int'l. Co. v. Datronics,* 254 Md. 327, 347-348.

As to Exhibits 5A, 5B, 6A, 6B, 7 and 8, Stanley Frank Miller, Jr., comptroller for Bogley, Hasting, Mahoney and Lebling (Bogley), mortgage bankers, through whom the Scholls had arranged the financing on their property, testified that 5A, the first page, and 5B, the second page, was a form sent out by the firm's "closing department". He worked in the accounting and mortgage servicing departments but identified the document as a form used by the firm. The document comprising Exhibits 5A and 5B was a carbon copy of a two page letter on the Bogley letterhead. In the main part printed, it was addressed to Gordon & Myers under date of 22 August 1966 and informed them that Bogley had granted a VA loan to the Scholls, and gave in precise detail how the transaction was to be handled. Printed at the end was "Rev. 9/64" indicating it was a form as revised in September 1964. Exhibit 6A was a form entitled "Interim Title Insurance Binder" of Lawyers Title Insurance Corporation (Lawyers). Again in the main part printed, it was addressed to Bogley and the VA, signed by the President and Sec-

retary of Lawyers and countersigned by Lawyers' agent, Central Title Agency, Inc. It was exactly what its title stated, an interim title insurance binder on the property the Scholls were purchasing. Printed thereon was "Form 19-1". Attached thereto was Exhibit 6B, entitled "Report on Title", a document of Lawyers, designated as "Form No. 91-79." Also in the main part printed, it gave the status of the record title of the property. The documents were identified by Miller as "a title insurance binder from Lawyers Title Insurance Corp." Exhibit No. 7 was identified by Miller as "the check that we use in making disbursements on loans." It was a check dated 9/8/66 made by Bogley to Gordon & Myers in the amount of $18,130.35 and endorsed by Gordon & Myers for deposit only. Stampings on the back showed that it had been paid by the bank on which it was drawn. Exhibit 8 was identified by Miller as "a copy which we keep in our files of this same check. There are four copies of this check, the original and three copies. It lists the sales price, the points withheld from the purchaser and seller, various escrow funds and any other funds that "have been held." It was also in the main part a printed form with blanks completed in typewriting. On cross-examination Miller said that a Sydney Thompson was in charge of the closing department. Robert J. Bolger, who said he was employed by Lawyers from November 1966 through November 1969 as an assistant title examiner, identified Exhibits 6A and B as an "Interim Title Insurance Binder" of Lawyers, its purpose being to establish the conditions of settlement by an approved attorney. He explained this in detail. Even a cursory examination of these documents indicates that they were records kept in the regular course of business by Bogley or Lawyers, as the case may be, and that it was certainly the regular course of business to make such records or copies thereof. We think that the statutory requisites for admissibility of these exhibits were met. We cannot say that the lower court's admission of Exhibits 5A, 5B, 6A, 6B, 7 and 8 were erroneous. We believe the elements of neces-

sity and circumstantial guaranty of trustworthiness were clearly present.

In his brief Gordon identifies Exhibits 10A and 10B as photostats of a Deed of Trust note concerning which Bolger testified. But Exhibit 10A was the original of Exhibit 6B, Lawyers report of Title of the Scholl property, and Exhibit 10B was the original of an endorsement thereto. Both were patently records made by Lawyers in the regular course of business and clearly it was the regular course of their business to make such records. They were admissible for the reasons set out above as to the other exhibits. It was Exhibit 11 which was a photostatic copy of the deed of trust note. Bolger identified it as a copy of the note signed by persons from whom the Schoils bought the property here involved. After argument as to its admission defense counsel said he had "no objection to that coming in as a copy of the note on the date it was taken." But he preserved "the shop book objection to it." Bolger specifically identified the note as that which had been purchased by Lawyers "because it had not been paid off at a settlement in which its payoff was one of the conditions of the binder issued by one of our agencies." It is perfectly apparent from the document itself that the original note was made as a record of the transaction between the parties designated therein and that it was made in the regular course of business. The objection to its admissibility not going to the fact that it was a copy, it was admissible under the statute.

We hold there was no error in the admission of the challenged exhibits.

### (7)

In considering the contentions concerning the charge to the jury we observe that although it is encumbent upon the court when requested in a criminal case to give an advisory instruction on every essential question or point of law supported by the evidence, *Malloy v. State*, 4 Md. App. 420, it need not grant any requested instruction if the matter is fairly covered by the instructions actually

given, Rule 756 b, *Harris v. State,* 11 Md. App. 658. See *Nelson v. State,* 5 Md. App. 109. We further note that the adequacy of instructions is determined by viewing them as a whole, that is considering them in their total context. *Shotkosky v. State,* 8 Md. App. 492, 508. See *Graef v. State, supra.*

### (a)
### (i)

Gordon's eighth prayer in his request for instructions, citing *Gordon primus* as authority, read:

> "The State has alleged the ownership of the funds, alleged to have been embezzled, to be in Raymond Francis Scholl, Jr. and Mary E. Scholl.
>
> The State is therefore required to prove ownership of these funds, as laid in the indictment, that is, that the proof in order to sustain the embezzlement count, must show, beyond a reasonable doubt, that the money was owned by the Scholls, at least in the sense that they had any legal interest or special property right in it at the time of the conversion; otherwise you must find Milton Gordon not guilty."

He was aggrieved below because the court did not deliver the instruction as requested. He objected to the instruction on ownership of the funds. "We ask your Honor to instruct the jury that the money must be shown to have been owned by the Scholls, at least in the sense they had any legal interest or special property in it at the time of the conversion." The court thought it had done so. We also think so.

The court advised the jury:

> "You have heard the charge that these were the funds of Raymond and Mary Scholl. That does not mean they have to be the actual owner, in the legal sense of ownership, of the cash

money that each of you have in your pocket. If you find they have a special interest in these funds—and in this particular case we are not dealing with coins or bills as such; we are dealing with representation of funds by way of checks and bank accounts—if you find that the Scholls had a special interest in funds of that kind, then you could find they were the owners of those funds, within the meaning of the law and within the meaning of this indictment. It does not have to be ownership in the strict legal sense to the exclusion of everybody else. If there is a special interest of the Scholls in these funds, then they may be said to be the owners within the meaning of the embezzlement statute."

In *Loker v. State,* 250 Md. 677, it was said in the opinion of the Court, at 684:

"[I]n indictments for larceny an allegation of the ownership of stolen goods may be supported by proof of any legal interest or special property in the goods, *Richardson v. State,* 221 Md. 85, 156 A. 2d 436, and we feel that no more stringent requirement with respect to embezzlement should be applied than to a claim of variance with respect to a charge of larceny."

In the total context of the court's charge here as to ownership of the funds we do not feel that the jury was misled or that the use of the phrase "special interest" by the lower court rather than "legal interest or special property" resulted in a misstatement of the law. We find no error compelling reversal in the instructions on ownership of the funds.

### (ii)

Gordon excepted to the court's "failure to instruct that it is necessary for the State to prove beyond a reasonable doubt that the defendant had actual * * * possession of

the money alleged to have been embezzled and not merely constructive possession." As part of the charge the court had read to the jury Code, Art. 27, § 129. The trial judge replied: "I think I gave that when I read the statute which said, 'Other valuable security or effects was not received in the possession of such master or employer, otherwise than by the actual possession of his cashier, servant, officer or clerk.' " We think that the instruction given stated the applicable law and find no prejudicial error in the refusal to supplement the instructions as requested in the exception.

### (b)

One of the essential elements of embezzlement as prescribed by statute is that the accused was employed as a cashier, servant, agent, clerk or officer by the person or corporation whose property he stole. Code, Art. 27, § 129. Here as the money stolen was that of the Scholls, it was necessary that the State prove that Gordon was the agent of the Scholls. In its instructions the court, after explaining that an attorney at law could be a cashier, servant, agent, officer or clerk, within the meaning of the statute, said, "The essence of the offense, trying to boil it down so that it is more intelligible to those not trained in the law, is this: By this section it is required that there be proof that the accused, Mr. Gordon, was employed as a cashier, servant, agent, clerk or officer by a person or body corporate, bearing in mind as an advisory instruction, and I tell you that an attorney at law may be found within this section."

Excepting to the charge, defense counsel said: "I think your Honor instructed the jury they only must find that the accused was a servant, agent or cashier of a person or a body corporate. I think they ought to know they must find he was an agent of the Scholls rather than of any person." The court said, "I will let you argue that, Mr. Miller. I gave the jury exactly what the statute says, and I said they have to prove the ownership or special interest in the Scholls. I will let you argue that they [he]

had to be employed by them before they can find a special interest. * * * They have to prove this crime as stated in the indictment. They cannot find him guilty because he might be guilty of other crimes." Gordon perseveres in the argument on appeal. He urges that because the court did not instruct that the jury must find Gordon to be the agent of the Scholls, they were permitted to find that he "need only be an agent of any person or body corporate." We do not think that the instructions given, taken in their total context, permitted the jury to do as Gordon suggests. We find that the instructions made sufficiently clear that the jury, to convict, had to find that Gordon was the agent of the Scholls.

First we observe that the court after advising the jury that it was required that there be proof that Gordon was an agent and that an attorney at law could be an agent, continued: "Second, that in such capacity he received personal property or money for or in the name, or on account of his master or employer. Third, that he thereafter fraudulently embezzled such property." The court told the jury that the "State must prove this charge beyond a reasonable doubt exactly as it is charged in the indictment." It explained to them that there was evidence of possible embezzlement from other people and other amounts involved but the use of that evidence was restricted to show a common scheme or an intent. "You should not find him guilty of this specific crime merely because you think he may have committed other crimes. * * * If you do not find this specific crime is true beyond a reasonable doubt, then your verdict should be not guilty * * *." Of course, the statute, which the court read to the jury, provides that whosoever being an agent to any person or corporation shall fraudulently embezzle any money received for his employer shall be deemed to have feloniously stolen such money. In the light of (a) the statutory provision that the crime is committed when an agent steals money received by him for his employer, (b) the allegation in the indictment that the embezzled money was that of the Scholls, (c) the advice to the jury

that it could convict only upon proof of the crime as charged, (d) the advice that the money stolen had to be owned, as defined, by the Scholls—"it has got to be these funds that we are dealing with of the Scholls," and (e) the advice to the jury that it must find that it was as agent that Gordon received money for or in the name or on account of his employer, we do not believe there was the lacuna in the charge as alleged by Gordon. We think the instructions as a whole made sufficiently clear to the jury that to convict Gordon of the crime charged they must find that he was the agent of the Scholls. Thus the charge adequately stated the applicable law. We hold that the lower court did not err in refusing to amplify the instructions given.

*Judgment affirmed; cost to be paid by appellant.*